Filed 10/9/14  In re L.B. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re L.B., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E060790 |
| Plaintiff and Respondent, | (Super.Ct.No. SWJ1100602) |
| v. | OPINION |
| M.B., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  John M. Monterosso, Judge.  Affirmed.

Pamela Rae Tripp, under appointment by the Court of Appeal, for Defendant and Appellant.

Gregory P. Priamos, County Counsel, Julie Koons Jarvi, Deputy County Counsel, for Plaintiff and Respondent.

1

Appellant M.B. (mother) appeals from the juvenile court's denial of her Welfare and Institutions Code[1] section 388 petition regarding her child, L.B. (the child). We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

On September 8, 2011, the Riverside County Department of Public Social Services (DPSS) filed a section 300 petition on behalf of the child, who was 15 months old at the time. The petition alleged that he came within section 300, subdivisions (b) (failure to protect) and (g) (no provision for support). The petition included the allegations that mother neglected the child's health, safety, and well-being, in that the family home was found to be unsafe and unsanitary. There were five dogs living in the house, and there was dog feces on the floor; there was also scattered trash on the floor, as well as several prescription drug bottles within the child's reach. The petition further alleged that mother abused controlled substances and had unresolved mental health issues. Additionally, the petition alleged that mother and the child's father (father)[3] had a history of domestic violence, and father was recently incarcerated for such acts.

The social worker filed a detention report and stated that DPSS received a referral alleging general neglect. The child came out of his house unsupervised, and fell off the

---

[1] All further statutory references will be to the Welfare and Institutions Code, unless otherwise noted.

[2] On the court's own motion, we incorporated the record in case No. E058416, in the record of the instant case, case No. E060627.

[3] Father is not a party to this appeal. Thus, this opinion will not discuss the allegations or proceedings with regard to him.

2

curb. Mother was in the house and appeared to be under the influence. About one week later, DPSS received another referral for general neglect. It was reported that mother was hospitalized for a bug bite, and she asked for a "cocktail" of medications, she was 24 weeks pregnant, and she had not received prenatal care. On September 6, 2011, the social worker went to mother's home and was invited in by the maternal grandmother. There were five dogs in the house, and she observed one of the dogs urinate on a stuffed animal. The social worker also observed dirty floors and scattered trash. Mother returned home shortly thereafter and said the child and his cousin had made the house messy earlier that day. Mother showed the social worker the rest of the house, and the social worker noted that mother's room was extremely cluttered, with clothes, empty soda bottles, trash, and several prescription medication bottles lying on the floor, within reach of the children in the home. The social worker asked mother about her drug use, and mother admitted that she used medical marijuana and took Diphenhydramine, Omeprazole, and Vicodin. Mother agreed to take a saliva test. It came back positive for methamphetamine and opiates. Mother said the test results were not correct. She admitted that she was pregnant and had not yet had prenatal care, and that she had bipolar disorder and depression. She said she was not currently taking medication for her mental health issues. Mother said she was paid monthly to be her mother's caregiver. She also said that father had been incarcerated since January regarding a domestic violence incident with her. The social worker took the child into protective custody.

At a detention hearing on September 9, 2011, the court detained the child in foster care. The court ordered visitation to be twice a week.

3

*Jurisdiction/disposition*

The social worker filed a jurisdiction/disposition report on October 11, 2011, recommending that the court declare the child a dependent and offer mother reunification services. The social worker interviewed mother, who said she was taking pain medication for leg and back pains, Benadryl for sleep, and other medication for acid and nausea. Mother reported that she first tried marijuana when she was 13 years old (she was 22 at the time of the interview). She still smoked it "when [she] was around people," but said she last smoked it two months prior. She first tried methamphetamine when she was 15 years old, and said she used it "between pregnancies," but quit on October 15, 2009. She had never participated in a drug treatment program. Mother reported that her current pregnancy was her eighth one.

The social worker further reported that the child moved from his previous foster home and was placed in the same foster home as his cousins. Mother was having regular visits with the child.

A contested jurisdiction/disposition hearing was held on November 16, 2011. The social worker filed an amended petition, which deleted some of the specific factual allegations from the original petition. The court sustained the amended petition and adjudged the child a dependent of the court. The court ordered mother to participate in reunification services and ordered the prior visitation order to remain in full force. Mother's case plan included the requirements that she complete a domestic violence program, participate in general counseling, participate in a psychological evaluation, and consult with a psychiatrist regarding the appropriateness of psychotropic medication,

4

complete a parenting class, participate in random drug testing, and complete a substance abuse program.

*Six-month Status Review*

The social worker filed a six-month status review report on May 3, 2012, recommending that the court continue mother's services. Mother had made progress in some areas, but continued to struggle with prescription narcotic drug use. She completed a parenting education program, domestic violence program, and psychological evaluation. However, her drug tests had been positive for narcotics, and she appeared to be eliciting false results at times with diluted tests. Mother continued to reside in the same residence.

On May 15, 2012, the court held a six-month review hearing, continued mother's services, and set a 12-month review hearing.

*Twelve-month Status Review*

The social worker filed a 12-month status review report and recommended that mother receive an additional six months of services. Mother had made significant progress in her services. However, the child could not safely be returned home. An unannounced home visit revealed her home to be in a deplorable condition, with empty vodka and prescription bottles accessible to the children and multiple safety hazards present. Furthermore, mother referred to having multiple "brothers" who would have access to the child. Each of these men had recent, violent criminal histories, as well as Child Protective Services (CPS) histories. Mother was admonished about associating

5

with these men, who would bring her vodka bottles, and about surrounding herself with alcohol.

A 12-month status review hearing was held on November 15, 2012. The court continued her services and set an 18-month review hearing.

*Eighteen-month Status Review*

The social worker filed an 18-month status review report on February 22, 2013, and recommended that the court terminate mother's services and set a section 366.26 hearing. Mother moved to a two-bedroom apartment with her mother and continued to be her mother's caregiver. Mother reported that she was in a new relationship with a man who did not have a criminal history. She reported that she had lupus anticoagulant, a history of blood clots, high cholesterol and blood pressure, heart arrhythmia, and chronic headaches. She was also given a mental health diagnosis of a mood disorder, not otherwise specified, and bipolar disorder.

The social worker reported that mother completed an outpatient substance abuse program on September 25, 2012, and was participating in an aftercare program. However, mother tested positive for opiates on December 4, 2012. She tested negative on January 16, 2013, but again tested positive for opiates on January 23, 2013. She explained that she had a prescription for pain medication due to some completed dental work. Mother showed the social worker her prescription. However, mother had nine missing tablets that she could not account for.

The social worker further reported that, while mother had attended 10 counseling sessions, she abruptly stopped attending.

6

Furthermore, the social worker reported that mother's housing situation was "chaotic and unstable." She continued to refer to having relationships with multiple "brothers" who had criminal and CPS histories. She also said she recently had a roommate who was a long-term methamphetamine user, with a CPS history, whose parental rights were terminated as to her three children.

The social worker opined that, after 18 months of services, mother had failed to make the lifestyle changes necessary to safely reunify with the child. She was living in her third residence since the last hearing in November 2012, she recently tested positive for opiates and had nine painkillers missing from her prescribed medication, and she continued to associate with drug users and felons. Moreover, father was recently released from prison, and mother was considering dismissing the restraining order she had against him, in order to allow him to see the child. In addition, mother was convicted of shoplifting on September 24, 2012, and was placed on probation. She failed to disclose this conviction to DPSS.

The social worker filed an addendum report on March 21, 2013. She again reported that mother had positive drug test results in November 2012 and December 2012, refused to test on January 10, 2013, and tested positive in January 2013. On March 12, 2013, she did not show up for a drug test. The social worker was concerned that mother had not demonstrated lifestyle changes indicative of long-term sobriety, even after 18 months of services. Mother continued to associate with people who had significant substance abuse and criminal histories.

The court held an 18-month review hearing on March 26, 2013. It acknowledged that mother had actively participated in her case plan, but found that she had not benefitted from her services. The court noted her recent positive drug tests, domestic violence incident, and missed drug tests. The court found by a preponderance of the evidence that the return of the child to mother would create a substantial risk of detriment to the safety, protection, and well-being of the child. It further found that DPSS had provided reasonable services, but mother had not made substantive progress in her case plan. The court thus terminated her services and set a section 366.26 hearing for July 25, 2013.

On April 2, 2013, mother filed a Notice of Intent to File Writ Petition. However, the case was dismissed for failure to file a timely petition.

*Section 366.26 and Section 388*

The social worker filed a section 366.26 and section 366.3 permanency status review report on June 18, 2013. The social worker recommended that the permanent plan for the child be adoption, but that the section 366.26 hearing be continued for 120 days, since he was not currently in a prospective adoptive home. The court continued the hearing.

The social worker subsequently filed an addendum report on November 14, 2013, and recommended that the court proceed with terminating parental rights. The child was placed with prospective adoptive parents on October 16, 2013. He was developing a strong bond with the prospective adoptive parents' adopted son. The family was providing the child with a structured, consistent, and loving home, where he was thriving.

8

The prospective adoptive parents were dedicated to providing a permanent home for the child.

On November 20, 2013, the social worker filed another addendum report. She reported that mother's boyfriend was arrested for exhibiting a deadly weapon. (Pen. Code, § 417, subd. (a)(1).) The social worker continued to recommend that parental rights be terminated and that the permanent plan be adoption with the current caregivers.

On November 21, 2013, mother filed a section 388 petition, requesting the court to reinstate her reunification services and authorize unsupervised visits to include overnight and weekend visits. She eventually wanted to be placed on family maintenance. As to changed circumstances, mother alleged that on November 25, 2013, she would have been clean for 357 days. She further alleged that she completed a treatment program and aftercare, that she continued to attend self-help meetings, and that she "relocated away from bad influences." As to best interests of the child, mother alleged that she and the child were bonded and that she visited him regularly. She attached a letter to the petition, which asserted that she loved the child with all her heart and soul, and he would be able to know his family loved him with her. Mother further alleged that she could financially care for him, she asked her boyfriend to move out, she had a strong support from the peers in her self-help group, and she had the tools needed to help her with long-term sobriety. Mother stated that she did not break up with her boyfriend (but just had him move out) because she "knew of his innocents [*sic*]."

On January 13, 2014, the social worker filed a section 366.3 post permanency status review report. The social worker stated that mother relocated to a two-bedroom

9

apartment, and that she and her boyfriend were listed on the lease. The social worker reported that, on September 20, 2013, mother was cited for trespassing at Walmart, and her boyfriend was arrested there for theft. Her boyfriend was also recently convicted of shoplifting. The social worker opined that there would be a substantial risk of detriment to the child if returned to mother's care. Mother continued to have people in her life that were involved in criminal activity, and she failed to recognize this as a safety threat to the child.

On January 27, 2014, the court held a combined section 388 and section 366.26 hearing. Mother testified regarding the section 388 petition. She said that she broke up with her boyfriend on or around November 30, 2013, because he was not going to be a good role model for the child. She said her boyfriend was currently still on her apartment lease, but the landlord was going to rewrite it to take him off. Mother further confirmed that she was cited for trespassing at Walmart because she had previously been arrested for shoplifting there; thus, she was banned from going into any Walmart nationwide. She was not aware of any criminal matter pending with regard to the trespassing citation. Mother also confirmed that she recently tested positive for opiates because she was taking prescription opiates for her lupus condition. Mother testified that she supported herself by providing home healthcare for her mother and brother.

On cross-examination, mother testified that she believed it was in the child's best interest to have her services reinstated because she was his mother, she loved him, and she could provide a loving and stable environment for him. She added that she had never

harmed her child. Mother also confirmed that she took antipsychotic medicine to prevent her outbursts of anger. Her last outburst was several months ago.

After hearing mother's testimony and counsels' arguments, the court summarized mother's case, noting that the child was removed at a very young age, and mother was originally given six months to reunify with him. Throughout the case, the court stated that mother always appeared to be doing just enough to get her services extended. However, by the time of the 18-month hearing, there was still a risk, and the child could not be placed with her. The court acknowledged that she maintained consistent visitation, but noted that her situation now was not much different than it was when her services were terminated. The court opined that mother's priority appeared to be her boyfriend, observing that there was a long gap between the time he was arrested in September 2013 and the time she decided to end their relationship at the end of November 2013. The court asserted that was a critical two-month period, and mother could have acted sooner. The court again stated her situation was not much different now, and concluded that it could not find a change of circumstances. The court further stated that, even if there was a change of circumstance, there was nothing to suggest a likelihood of success if it granted six more months of services. The court concluded that the child needed permanency, since he had been in foster care most of his life, and it was not in the child's best interest to delay his opportunity for permanency with the prospective adoptive family. Thus, the court denied mother's section 388 petition. The court went on to terminate parental rights and release the child for adoption.

11

ANALYSIS

The Court Properly Denied Mother's Section 388 Petition

In her opening brief, mother argues that the juvenile court abused its discretion in denying her section 388 petition. In her reply brief, she argues that she should have been granted an evidentiary hearing on her petition. The record shows that the court held a hearing on the petition. Mother testified, and counsel presented arguments. We conclude that the court properly denied the petition.

A. *The Court Did Not Abuse its Discretion*

A juvenile court order may be changed, modified or set aside under section 388 if the petitioner establishes by a preponderance of the evidence that (1) new or changed circumstances exist, *and* (2) the proposed change would promote the best interest of the child. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 316-317 (*Stephanie M.*), italics added.) A section 388 petition is addressed to the sound discretion of the juvenile court, and its decision will not be disturbed on appeal in the absence of a clear abuse of discretion. (*Id.* at p. 318.) "After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount. Rather, at this point 'the focus shifts to the needs of the child for permanency and stability' [citation], and in fact, there is a rebuttable presumption that continued foster care is in the best interest of the child. [Citation.] A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interest of the child." (*Id.* at p. 317.)

The juvenile court here did not abuse its discretion in denying mother's section 388 petition, as she failed to show changed circumstances or that a changed order would be in the child's best interests. At the time the court terminated mother's services, the concerns were that mother had not demonstrated lifestyle changes indicative of long-term sobriety, and that she continued to associate with people who had significant substance abuse and criminal histories. In her petition, as to changed circumstances, mother contended that she had been clean for nearly one year, she completed a treatment program and continued to attend self-help meetings, and she "relocated away from bad influences." The handwritten letter mother attached to the petition stated that she had asked her boyfriend to move out because of his recent criminal charges. However, they did not break up, as she believed that he would get the matters dismissed since he was innocent. By the time of the January 27, 2014 section 388 hearing, mother claimed that she was no longer in a relationship with her boyfriend. The court noted mother's acknowledgement that her boyfriend was not going to help mother get the child back, but pointed out that she waited for two months after her boyfriend was arrested at Walmart to end the relationship. The court surmised that, until mother filed the section 388 petition, she "had other priorities," namely, her boyfriend. We further note that her boyfriend was still on mother's apartment lease, as of the hearing. Thus, the evidence indicated that mother's situation was changing, but had not changed.

Even if mother had shown a change of circumstance, she was unable to demonstrate that a changed order was in the best interests of the child. "[A] primary consideration in determining the child's best interest is the goal of assuring stability and

13

continuity." (*Stephanie M.*, *supra*, 7 Cal.4th at p. 317.) As to the best interest of the child, mother alleged that she and the child were bonded, she visited regularly, and the visits went well. Mother clearly failed to show *how* it would be in the child's best interests to reinstate her reunification services. Her circumstances did not assure the court of any stability or continuity. (*Ibid.*) She had apparently been living in her apartment for only a short time, as the social worker first reported that mother had moved in the report filed on January 13, 2014. We further note that, although mother testified that her landlord was "in the process of" taking the boyfriend off the lease, mother also said he was on the lease "because of qualifying issues." On cross-examination, mother admitted that she had never had a lease in just her name before. In other words, there could be an issue with mother qualifying for the apartment on her income alone.

Furthermore, the juvenile court properly recognized the shift of focus and determined that a change of placement was not in the best interest of the child. The child was placed with a prospective adoptive family on October 16, 2013. He quickly developed a strong bond with the prospective adoptive family's adopted son. The child was also attached to the prospective adoptive parents. The prospective adoptive parents were able to meet his physical, developmental, and emotional needs. They were providing him with a structured, consistent, and loving home environment, and he was thriving there. They were dedicated to providing permanency for the child. The court noted that, although the child had only lived there for a few months, that was not the issue. Rather, the court pointed out that the child had been out of mother's care for the vast majority of his life. The court properly concluded that it was not in the child's best

14

interest to delay his opportunity for permanency by reinstating mother's services. As the court emphasized, the child needed permanency, not uncertainty.

We conclude that the court carefully evaluated the evidence, determined that mother had not carried her burden of proof, and properly denied mother's section 388 petition.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


HOLLENHORST

Acting P. J.


We concur:


KING

J.


MILLER

J.


15